UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIO ALEXIS and | : | CIVIL ACTION NO.: |
| DOUGENIE ALEXIS | : | 3:17-cv-01622-MPS |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PMM ENTERPRISES LLC d/b/a EMPIRE | : | |
| AUTO GROUP LLC and SENSIBLE AUTO | : | |
| LENDING, LLC | : | |
| Defendants | : | MARCH 16, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT**

Plaintiffs, Mario Alexis and Dougenie Alexis ("Plaintiffs"), by their attorneys,

submit this memorandum of law in support of their motion for judgment against

Defendant PMM Enterprises LLC d/b/a Empire Auto Group LLC ("Empire Auto")

following an entry of default on January 19, 2018 (Doc. No. 15) for failure to appear.

Plaintiffs request that judgment enter in the amount of $30,886.84.

## I.    INTRODUCTION

This is an action brought by two consumers against an automobile dealership for

violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, the Electronic

Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.,* and for breach of express and

implied warranty of merchantability under the Magnuson-Moss Warranty Act ("MMWA"),

15 U.S.C. §§ 2301 *et seq.*  Plaintiffs also asserted pendent state law claims against the

dealership for violations of the Connecticut Unfair Trade Practices Act ("CUTPA"),

Conn. Gen. Stat. §§ 42-110 *et seq.*  Plaintiffs settled their claims against Defendant

1

Sensible Auto Lending, LLC ("Sensible"), the assignee of the retail installments sales contract, in early December 2017.

## II.     STANDARD OF REVIEW

In *GE Group Life Assurance Company v. Ruzynski*,[1] the principles applicable to entry of a judgment following default were well-summarized as follows:

> It is well established that a party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the sound judicial discretion of the court.[2] In civil cases, however, "where a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party."[3]

In deciding the extent of damages to be awarded in a default judgment, the court must consider several factors including (1) the monetary award requested; (2) the prejudice suffered by the Plaintiff; (3) whether or not the default is clearly established and (4) the nature of the Plaintiff's claims against the defendant.[4]

With respect to the above criteria, the Second Circuit has provided some guidance, stating:

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give [Plaintiffs] a blank check' to recover from [defendant] any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded....[5]

---

[1] 2004 WL 243346 (D. Conn. 2004).
[2] *Id.* citing *Cablevision of S. Conn. Ltd. Partnership v. Smith*, 141 F.Supp.2d 277, 281 (D. Conn. 2001) (quoting *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir.1999)).
[3] *Id.* citing *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir.1984).
[4] *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1152 n. 11 (2d Cir. 1995) (citing 10 Moore's Federal Practice § 55.20[2][b]).
[5] *Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992).

"[W]here the quantum of damages is not liquidated and is not a readily ascertainable sum, the plaintiff must prove damages before the entry of a final default judgment."[6] "In reaching the decision as to the amount a plaintiff is entitled to recover, the Court may rely on detailed affidavits or documentary evidence to determine the appropriate sum [to be awarded pursuant to] the default judgment."[7] "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation."[8]

However, in making this determination and evaluating the allegations asserted against the defendant, the court may "deem[ ] all the well-pleaded allegations in the pleadings to be admitted" by the defendant.[9]

## III. FACTUAL ALLEGATIONS

The following facts are set forth in the Complaint, admitted by Empire Auto in default, and in Mario Alexis' Affidavit.

On or about October 8, 2016, Mario Alexis ("Mario") went to Empire Auto because he was interested in purchasing a car and he looked at a 2013 Lincoln MKZ (the "Vehicle").[10] Mario asked the Empire Auto salesman if the Vehicle had ever been in an accident and the salesman told him the car was clean and had never been in an accident.[11] Empire Auto told Mario the price of the car was $16,900.[12]

---

[6] *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992)
[7] (Internal quotation marks omitted.) *Teamsters Local 639-Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008).
[8] *Hunt v. Inter–Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir.1985)(*citing Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir.1983))
[9] *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997).
[10] Mario Alexis Affidavit, ¶ 3.
[11] Id. ¶ 4.
[12] Id. ¶ 5.

Based upon Empire Auto's representations that the Vehicle was clean, had never been involved in an accident, and its agreement to sell the Vehicle for $16,900, Plaintiffs agreed to purchase the Vehicle.[13] Plaintiffs paid a down payment of $2,000.00 to Empire Auto and financed a balance of $17,688.29 pursuant to a retail installment contract that was assigned by Empire Auto to Sensible (the "Contract").[14] Empire Auto listed a sale price of $18,000 on the Contract, an amount that was $1,100 more than Plaintiffs agreed to pay.[15]

Mario questioned Empire Auto's employee regarding the increased price of the Vehicle, he was told that the higher price included a bank fee. That "bank fee" was added to the price of the Vehicle in order to compensate Empire Auto for the cost of arranging financing through Sensible.[16] Plaintiffs were not provided with copies of the Purchase Order or Contract at the time they signed the paperwork.[17]

In or around July, 2017, Mario became interested in trading-in the Vehicle, and he brought the Vehicle to another dealership to obtain an appraisal, and he learned at this time that the Vehicle had prior damage.[18] On or about August 8, 2017, Plaintiffs had the Vehicle inspected by an independent auto body expert to obtain an assessment of the extent of any prior damage.[19]

The independent expert determined that the Vehicle had been involved in a prior event that caused structural damage to the rear and left side of the Vehicle, and the Vehicle was improperly repaired and was not in merchantable condition and was unsafe

---

[13] Id. ¶ 6.
[14] Id. ¶ 7, Exhibit A.
[15] Id. ¶ 8, Exhibit A.
[16] Complaint, ¶ 17.
[17] Mario Alexis Affidavit, ¶¶ 10-11.
[18] Id. ¶ 13.
[19] Id. ¶ 14.

to drive.  He further opined that any automotive professional performing a simple visual inspection could clearly see that the Vehicle had been wrecked, was unsafe and poorly repaired.[20] Empire Auto knew of the Vehicle's structural damage, because the existence of the structural damage would have been discovered during a mandatory state safety inspection.[21]

Upon learning that the Vehicle had significant structural damage and was not safe to drive, Plaintiffs returned it to Empire Auto on August 27, 2017.[22] On August 28, 2107, Plaintiffs, through their attorney, notified Empire Auto and Sensible that they revoked their acceptance of the Vehicle.[23] The Plaintiffs have returned the Vehicle to Defendants and have placed them in their original position prior to the transaction, or as close to that position as possible.[24]

The defendant has failed and refused to refund to Plaintiffs their deposit and the amounts that they paid under the Contract.[25]

## IV.    PLAINTIFFS' LEGAL CLAIMS
### a.  Truth in Lending Act

TILA is a remedial, strict liability statute that is to be liberally construed, and it requires no proof of deception or actual damages to obtain relief thereunder.[26]  Any

---

[20] Id. ¶ 15. Exhibit B.
[21] Complaint ¶ 22.
[22] Mario Alexis Affidavit, ¶ 16.
[23] Id. ¶ 17.
[24] Id. ¶ 18.
[25] Id. ¶ 19.
[26] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.,* 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1, 2 (10th Cir. 1975) (en banc).

defects in the disclosure process, even technical defects, must be recognized without requiring any proof that the consumer was confused.[27]

TILA's purpose is to ensure the accurate and meaningful disclosure of the cost of consumer credit and to enable consumers to make informed choices in the credit marketplace. Our Supreme Court noted in *Mourning v. Family Publication Services, Inc.*[28] that unscrupulous merchants might attempt to circumvent TILA's objectives by "burying the cost of credit in the price of the goods sold". The Court gave an example of how a merchant might attempt to avoid the disclosure requirements:

> Two merchants might buy watches at wholesale for $20 which normally sell at retail for $40. Both might sell immediately to a consumer who agreed to pay $1 per week for 52 weeks. In one case, the merchant might claim that the price of the watch was $40 and that the remaining $12 constituted a charge for extending credit to the consumer. From the consumer's point of view, the credit charge represents the cost which he must pay for the privilege of deferring payment of the debt he has incurred. From the creditor's point of view, much simplified, the charge may represent the return which he might have earned had he been able to invest the proceeds from the sale of the watch from the date of the sale until the date of payment. The second merchant might claim that the price of the watch was $52 and that credit was free. The second merchant, like the first, has forgone the profits which he might have achieved by investing the sale proceeds from the day of the sale on. The second merchant may be said to have 'buried' this cost in the price of the item sold. By whatever name, the $12 difference between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.

The Supreme Court further elucidated that the Federal Reserve Board promulgated regulations (Regulation Z) in order to prohibit this well documented practice against a legislative background acknowledging this concern. Reg. Z

---

[27] *See Jenkins v. Landmark Mortgage Corp.*, 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).
[28] *Mourning v. Family Publications Serv.*, Inc., 411 U.S. 356, 366 (1973).

addresses the burying of a "finance charge" as part of the "cash price" by its definition of these terms. Cash price is defined as:

> The price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration. The term does not include any finance charge.

"Finance charge" is defined broadly in Reg. Z to include both direct and indirect amounts paid as an incident to or a condition of the extension of credit. Reg. Z, § 226.4(a), provides as follows:

> The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

The regulatory scheme therefore requires sellers to separate the cash price of goods sold on credit from charges that are imposed as an incident of the extension of credit and that are not charged in a comparable cash transaction; those charges must be disclosed as finance charges.

Empire Auto violated TILA in two ways: First, Empire Auto failed to provide Plaintiffs with a copy of the Contract, which contained the truth in lending disclosures, on the date the documents were signed. Therefore, Empire Auto violated TILA by failing to give Plaintiffs the required disclosures in a form that they could keep prior to consummation of the transaction.[29]

---

[29] Reg Z. § 226.17(a); *Polk v. Crown Auto*, 221 F.3d 691, 692 (4th Cir. 2000).

Second, the additional $1,100 charge was added as a "bank fee." Plaintiffs would not have paid this additional amount in a cash transaction. Empire Auto further violated TILA by failing to disclose the additional $1,100 charge as a finance charge and instead included that amount as part of the amount financed.[30] The $1,100 charge was incidental to the fee charged by Sensible to Empire Auto in accepting assigning of the Contract. A review of the Contract shows that the "bank fee" was simply rolled into the Vehicle's price. It was not separately listed and was also included as part of the amount financed, not the finance charge.

For its violations of TILA, Empire Auto is liable to Plaintiffs for statutory damages of $2,000 plus their actual damages of $1,100, and a reasonable attorney's fee pursuant to 15 U.S.C. § 1640.

### b. Electronic Funds Transfer Act

Empire Auto violated the EFTA by requiring Plaintiffs to set up automatic withdrawals of the loan payments as a condition of financing the Vehicle. Empire Auto, which was the original creditor under the retail installment contract,[31] violated the EFTA, 15 U.S.C. § 1693k, which prohibits creditors from conditioning the extension of credit upon the borrower's consent to repayment by preauthorized electronic transfers. Empire Auto is liable under 15 U.S.C. § 1693m for statutory damages of between $100 and $1,000 plus attorney's fees and costs.  Plaintiffs request the maximum award of $1,000.

---

[30] *Mourning*, supra. at 366.
[31] Alexis Affidavit, Exhibit A.

### c. Breach of Implied Warranty of Merchantability

This Count is asserted under Magnuson-Moss for Empire Auto's breach of the implied warranty of merchantability, Conn. Gen. Stat. § 42a-2-314. The Vehicle is a consumer product as that term is defined in § 2301(1) of MMWA. A warranty that the Vehicle was in merchantable condition at the time of sale was implied by the Contract by operation of Conn. Gen. Stat. § 42a-2-314.

"Under [General Statutes] § 42a–2–314 the warranty of merchantability is implied in any sale of goods by a merchant seller ...To recover under this section, a plaintiff must prove (1) that a merchant sold goods, (2) which were not merchantable at the time of sale, and (3) injury and damages to the plaintiff or his property (4) [were] caused proximately and in fact by the defective nature of the goods, and (5) [that] notice [was given] to the seller of injury."[32] As more fully described above, Plaintiffs have proven all five elements of breach of the implied warranty of merchantability.

For Empire Auto's breach of the implied warranty of merchantability, Plaintiffs are entitled to their damages pursuant to the UCC[33]. "Where … the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved … the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid…" These damages include a refund of the $2,000 down payment plus all installment payments made under the Contract. It also includes consequential damages of $650 for the cost of the inspection of the Vehicle.

---

[32] (Internal quotation marks omitted.) *Nassar v. Wiz Leasing, Inc.*, No. NNHCV126033894S, 2013 WL 4734851, at *4 (Conn. Super. Ct. Aug. 12, 2013).
[33] Conn. Gen. Stat. § 42a-2-711(1); *see also Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 123 (1976).

Consequential damages are recoverable in a warranty action if they are reasonably foreseeable.[34] In this matter, it is reasonably foreseeable to the seller that a latently defective vehicle would necessitate an inspection as proximate result of its failure to ensure its merchantability.

Plaintiffs also seek common law punitive damages[35] as the breach of warranty described herein was tortious in nature. "Under Connecticut law, punitive damages are available for a claim of breach of warranty if plaintiff alleges conduct that is done with a bad motive or with a reckless indifference to the interests of others."[36] "Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. If awarded, they are restricted to cost of litigation less taxable costs of the action being tried and not that of any former trial."[37] As stated in the attached report of Robert Collins, the Vehicle's structural damage would have been apparent to any automotive professional performing

---

[34] "A warranty action ... has a built-in limitation on liability ... The limitation in a contract action comes with the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach…" (Quotation marks and citations omitted.) *Source One Fin. Corp. v. Rd. Ready Used Cars, Inc.*, No. CV136034341S, 2014 WL 1013121, at *5 (Conn. Super. Ct. Feb. 14, 2014) *citing East River Steamship Corp. v. Transamerican Delaval,* 476 U.S. 858, 874, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

[35] "[T]he measure of punitive damages for a claim under the Magnuson-Moss Warranty Act is based upon what Connecticut state law would allow for a cognate claim of breach of warranty and that this measure of punitive damages is a common-law punitive damages award for the amounts expended by plaintiff for attorney's fees." *Poriss v. Gene Langan Volkswagen of Connecticut, Inc.*, No. 3:15-CV-01837 (JAM), 2016 WL 1271460, at *3 (D. Conn. 2016).

[36] (Internal quotation marks omitted.) *Angelillo v. Harte Nissan, Inc.*, No. 3:09-CV-1313 (WWE), 2010 WL 569887, at *3 *citing L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.,* 9 Conn.App. 30, 48, 514 A.2d 766 (1986).

[37] (Internal citations omitted.) *Vandersluis v. Weil*, 176 Conn. 353, 358 (1978).

a visual inspection.[38] Therefore, Empire Auto knew, or should have known, that the Vehicle was defective and would not be safe for Plaintiffs, or any consumer, to drive.

Under Conn. Gen. Stat. § 14-62(g), Connecticut dealerships are required to perform a safety inspection of a vehicle prior to offering it for sale. The results of that inspection are memorialized on the CT DMV K-208[39] form, and that form is required to provided to the consumer when they purchase a used car.[40] Empire Auto shirked its responsibility to perform this safety inspection, or if it did perform the inspection, it failed to provide Plaintiffs with the results. Had Empire Auto disclosed that the "frame/chassis" failed the safety inspection, it would not have been able to certify to Plaintiffs that the vehicle was in a condition for "legal operation of the highways of Connecticut."[41] In sum, Empire Auto's breach was tortious in that it breached the implied warranty of merchantability by selling Plaintiffs a vehicle that was unsafe to operate, posed a significant risk to the occupants, and those defects would have been readily apparent to any of the automotive professionals inspecting the Vehicle as part of their statutory obligation. Empire Auto's conduct was not a result of negligent conduct, but it acted with reckless indifference to Plaintiffs' rights.

Empire Auto is also liable to Plaintiffs for attorney's fees and costs pursuant to the MMWA, 15 U.S.C. § 2310(d). The MMWA does not create an additional basis for

---

[38] Mario Alexis Affidavit, ¶ 15. Exhibit B.
[39] Connecticut Department of Motor Vehicles Form K-208, available online at http://www.ct.gov/dmv/lib/dmv/20/29/k-208.pdf (Last accessed March 14, 2018).
[40] § 14-62(g).
[41] Id.

liability, but allows a consumer to recover damages under existing state law and attorney's fees.[42]

### d. Breach of Express Warranty

Empire Auto's statements regarding the condition and history of the Vehicle constituted an express warranty pursuant to Conn. Gen. Stat. § 42a-2-313.

> (1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description ... (2) It is not necessary to the creation of an express warranty that the seller use formal words such as " warrant" or " guarantee" or that he have a specific intention to make a warranty, but the affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.[43]

Empire Auto breached the express warranty because the Vehicle had structural damage at the time of sale to Plaintiffs and the Vehicle was unsafe to drive. Nevertheless, Empire Auto falsely told Mario that the Vehicle had never been in an accident. Empire Auto's representation that the Vehicle had been in an accident became part of the basis of the bargain. A statement that the Vehicle "had not been in an accident" was not mere puffery.[44]

---

[42] *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F.Sup.2d 519, 540 E.D.N.Y.2006), *citing Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C . Cir.1986)

[43] *Goldwater v. Ollie's Garage*, No. 357372, 1998 WL 83144, at *2– 3 (Conn. Super. Ct. Feb. 18, 1998) citing Conn. Gen. Stat. § 42a-2-313.

[44] *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 204 (Ill. App. Ct. 2008) (Dealership telling a consumer that a vehicle was "fine" when asked if it had previously been involved in an accident held not to be "mere puffery".)

Empire Auto's breach of express warranty was tortious in nature, intentional, in bad faith, and was wanton and malicious, outrageous, and undertaken with bad motive and with a reckless indifference to Plaintiffs' interests and the injury that they sustained.[45]  For Empire Auto's breach of the express warranty, Plaintiffs are entitled to an order that they validly and effectively revoked acceptance of the Vehicle pursuant to Conn. Gen. Stat. § 42a-2-608, as well as damages[46] consisting of a refund of their $2,000 down payment and all payments made under the contract, and common law punitive damages[47].

### e.  Connecticut Unfair Trade Practices Act

Connecticut courts use the "cigarette test"[48] in determining whether a trade practice is unfair under CUTPA:

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.... In order to enforce this prohibition,

---

[45] Plaintiffs incorporate by reference arguments made in subsection f above.
[46] Authorized by Conn. Gen. Stat. § 42a-2-711(1).

[47] Costs of bringing the suit as calculated by attorney's fees and non-taxable costs, *see Poriss*, supra.
[48] *See FTC v. Sperry & Hitchinson Co.,* 405 U.S. 233 (1972).

> CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice....[49]

Empire Auto's statutory violations of RISFA, TILA and EFTA invoke the "public policy" prong of an unfair trade practice.

By charging the "bank fee", which was a finance charge, the APR for the Contract exceeded the maximum allowable interest rate permitted by the Retail Installment Sales Financing Act ("RISFA")[50,51]. The APR before the addition of the "bank fee" was already 19%, the maximum permissible rate; therefore any additional finance charge would increase the APR above 19%.[52] Charging this rate further violated CUTPA. RISFA violations with actual damages can be considered CUTPA violations.[53]

Empire Auto's TILA and EFTA violations as described above are also CUTPA violations in that they offend the public policy prong of the cigarette test. The Connecticut Supreme Court held in *Cheshire Mortg. Service, Inc. v. Montes*[54] that a

---

[49] *Ulbrich v. Groth*, 310 Conn. 375, 409–10, 78 A.3d 76, 100 (2013)

[50] Conn. Gen. Stat. § 36a-771 et seq.

[51] "A retail seller of motor vehicles may charge, contract for, receive or collect a finance charge expressed as an annual percentage rate on any retail installment contract covering the retail sale of a motor vehicle in this state, which charge shall not exceed … on sales made on or after October 1, 1987… used motor vehicles of a model designated by the manufacturer by a year more than two years prior to the year in which the sale is made, nineteen per cent." Conn. Gen. Stat. § 36a-772.

[52] "For a used car over two years old, the maximum annual rate is 19%. Conn. Gen.Stat. § 36a–772 (a)(3)(C). Plaintiff contends that the interest rate in this instance exceeded 19%. The improper characterization of the $150 charge for single interest insurance as part of the amount financed, rather than part of the finance charge, did have the effect of lowering the annual percentage rate. Thus, Colonial has also violated RISFA." *Velasquez v. Natalino Motors, LLC*, No. 3:08-CV-1427 RNC, 2011 WL 4572060, at *5 (D. Conn. 2011)

[53] A RISFA violation satisfies the "public policy" prong of the cigarette test. *See Tillquist v. Ford Motor Credit Co.,* 714 F. Supp. 607, 616 (D. Conn. 1989); *Barco Auto Leasing Corporation v. House*, 202 Conn. 106, 520 A.2d 162 (1987).

[54] 223 Conn. 80, 114 (1992)

TILA violation may also constitute a CUTPA violation if the consumer can show substantial injury, generally in the form of a monetary loss.[55] More succinctly, the TILA violation must rise above a disclosure violation. In the instant matter, the "bank fee", which was charged incidentally to the extension of credit constituted a substantially injury in the form of monetary loss to Plaintiffs. It was improperly disclosed, or "buried" in the cost of the goods, and would have not been paid in a similar cash transaction. By burying the cost in the price, Plaintiffs were deprived of a meaningful opportunity to compare credit terms.

A violation of EFTA "offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness"[56], which would satisfy the public policy prong of the cigarette test. For example, in *Langan v. Johnson & Johnson Consumer Companies, Inc.*[57] the Connecticut district court concluded that although courts in this state had not previous recognized that a violation of the Federal Food, Drug and Cosmetic Act ("FDCA") could establish a CUTPA claim; it was a violation of an established public policy. Therefore, plaintiffs could proceed with a CUTPA case premised on a FDCA violation. Similarly, an EFTA violation constitutes an offense to public policy which creates liability under CUTPA even though such liability has not previously been considered or recognized.

---

[55] *Id.,* 113.

[56] *Ulbrich,* supra.

[57] 95 F. Supp. 3d 284, 290 (D. Conn. 2015) ("[P]laintiff has sufficiently pleaded a claim that defendant's statements are unfair in violation of CUTPA. First, plaintiff plausibly alleges that defendant's statements offend an established public policy: the FDCA's prohibition on sunscreen 'labeling [that] is false or misleading in any particular.'")

Additional CUTPA liability exists under Conn. Agency Reg. § 42-110b-28(b)(23), which provides that any violations of state or federal statutes or regulations regarding the sale of motor vehicles constitute *per se* violations of CUTPA.[58] Empire Auto's failure to perform a safety inspection on the Vehicle violated Conn. Gen. Stat. § 14-62(g). Or, if it did perform a safety inspection, it sold the Vehicle notwithstanding the defects and without furnishing Plaintiffs with a copy of the Connecticut Department of Motor Vehicles K-208 form as required by Conn. Gen. Stat. § 14-62(g). "Section 42–110b(c) of CUTPA provides that the Department of Consumer Protection (the 'DCP') may issue regulations that establish what acts, practices, or methods shall be deemed unfair or deceptive under CUTPA. Regulations regarding the conduct of car dealerships issued by the DCP provide that it is a *per se* violation for a car dealership to fail to comply with a state or federal law concerning the sale of motor Vehicles. Conn. Agency Reg. § 42–110b–28(b)(23). Therefore the Arbitrator not only did not display manifest disregard for the law, but correctly applied it based upon his finding Defendant violated Conn. Gen. Stat. § 14–62(g)."[59] A violation of § 14-62(g) is a *per se* violation by operation of § 42-110b-28(b)(23).

Additionally, it is *per se* violation of CUTPA to sell a vehicle for more than the advertised price.[60] While Plaintiffs have not contended that the Vehicle was sold for

---

[58] "Section 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides: 'It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation concerning the sale or lease of motor vehicles.'" O'Neill v. Country Motors, II, Inc., No. 3:15-CV-1069 (CSH), 2015 WL 8779594, at *9, n. 13 (2015).

[59] *Liebman v. Better Way Wholesale Autos, Inc.*, 243 F. Supp. 3d 208, 215 (D. Conn. 2017), vacated (June 29, 2017), appeal dismissed sub nom. *Liebman v. A Better Way Wholesale Autos, Inc.*, No. 17-1110, 2017 WL 4679426.

[60] Conn. Agency Reg. § 42-110b-28(b)(1)

more than the *advertised* price[61], they stated that the Vehicle was sold for more than the *agreed upon* price. As such, Empire Auto violated the policy of Conn. Agency Reg. § 42-110b-28(b)(1) by selling the Vehicle for $1,100 more than the agreed upon price. Connecticut courts have held that violations of the policy § 42-110b-28(b)(1) constitute CUTPA violations.[62]

Courts have also recognized that TILA and RISFA violations may serve as the basis for *per se* violations under § 42-110-28(b)(23): "Because the court in this case found that Atlantic violated TILA and RISFA, the court finds there is sufficient evidence that Atlantic engaged in unfair and deceptive acts in commerce or trade in connection with this transaction in violation of CUTPA."[63] The *Tirado* court reasoned:

> § 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides: "It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation concerning the sale or lease of motor vehicles." "The Connecticut Supreme Court has held ... that violations of the Federal Truth in Lending Act and of General Statutes § 36-224l (limiting charges on secondary mortgage loans) are unfair trade practices in violation of CUTPA ... A plaintiff who can establish a violation of either of these statutes does not need to allege or prove a violation of CUTPA in order to obtain substantive relief. If the plaintiff's lawyer is worth her salt, however, the complaint will additionally allege a CUTPA violation, because General Statutes § 42-110g(d) allows the court to award reasonable attorneys fees to the successful plaintiff."[64]

---

[61] Plaintiffs did not alleged that they ever saw an advertisement.

[62] *Emmanuelli v. Merriam Motors, Inc.*, No. X04CV020126869S, 2003 WL 22080496, at *2 (Conn. Super Ct. Aug. 25, 2003); *see also Valencia v. Crabtree Imports, Inc.,* No. X04CV020103613S, 2004 WL 424499, at *2 (Conn. Super. Ct. Feb 24, 2004) (Companion cases denying motions to strike, holding that CUTPA liability exists in selling a vehicle for more than the price stated on the Monroney Sticker (new car) sticker. Monroney Sticker was not an "advertisement" for purposes of CUTPA regulations, but selling vehicle for more than the price stated on the sticker "might violate duties arising under the common law or otherwise".)

[63] (Footnote omitted.) *Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *16 (Conn. Super. Ct. 2008)

[64] *Id.*, at *15 *citing Pechiney Corp. v. Crystal,* 43 Conn. Supp. 91, 99-100, 643 A.2d 319 (1994) [10 Conn. L. Rptr. 606]*, overruled in part on other grounds by Jade Aircraft Sales v. Crystal,* 236 Conn. 701, 674 A.2d 834 (1996).

*Tirado* bears close similarity to the instant matter in that Ms. Tirado's claims also involved a financing agreement with an improperly disclosed financing term (vendor's single interest insurance) and a retail installment sales contract with a 19% APR. The *Tirado* court also found that the disclosure violation and an APR exceeding 19% violated TILA and RISFA.[65]

As a result of Empire Auto's conduct, Plaintiffs have suffered ascertainable losses of money or property in that they paid a down payment of $2,000, they made payments under the contract of $7,243.42, they paid $650 to have the Vehicle inspected, and they lost use of the Vehicle. They were also charged $1,100 more than the agreed upon price by way of the erroneous and illegal "bank fee".

For Empire Auto's violations of CUTPA, Plaintiffs are entitled to their actual damages plus punitive damages and a reasonable attorney's fee.[66]

### f. Punitive Damages

"[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law... [including] punitive damages and attorney's fees. Section 42–110g does not specify how punitive damages are to be measured; however, the award should serve the broad remedial goals of eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices."[67]

---

[65] *Id.* at *2.
[66] Conn. Gen. Stat. §42-110g(d).

[67] (Internal citations and quotation marks omitted.) *Societa Bario E. Derivati v. Kaystone Chem., Inc.*, No. 5:90-CV-599 (EBB), 1998 WL 182563, at *10 (D.Conn. 1998).

Connecticut courts have recognized the deterrent aim of punitive damages by employing a relatively large multiplier in situations where the actual damages are comparatively small. In *Larobina v. Home Depot USA, Inc.*,[68] the appellate court upheld a 10x multiplier when compensatory damages were only $100 on the theory that "CUTPA is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices. To achieve that result, CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts. Encouraging claimants to walk away from unfair or deceptive practices does not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired."[69]

This approach has been similarly recognized in *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 149 (2011) (6x multiplier); *Benham v. Wallingford Auto Park, Inc.*, No. CV020459418S, 2003 WL 22905163, at *5 (7x multiplier); *Odell v. Wallingford Mun. Fed. Credit Union*, No. CV106012228S, 2013 WL 4734783, at *45 (3x punitive damages under CUPTA on top of 3x civil theft multiplier); *All Am. Custom Pools & Spas v. Schwindeman,* No. FSTCV044001335S, 2007 WL 866238, at *6. (Conn. Super. Ct. March 9, 2007) ($1 compensatory damages and $25,000 punitive damages).

Empire Auto's conduct in this case was particularly egregious and warrants an award of punitive damages to Plaintiffs. It misrepresented the vehicle's condition, but the undisclosed accident damage was not merely cosmetic. It was structural damage

---

[68]  76 Conn.App. 586 (2003).

[69]  *Id.* at 596.

that rendered the Vehicle unsafe to drive. Punitive damages, in an amount double the actual damages, are warranted under CUTPA.

### g. Attorney's Fees

Plaintiffs are entitled to an award of a reasonable attorney's fee and costs under TILA, MMWA, EFTA and CUTPA.

Consumers are to be awarded TILA attorney fees in "any successful action."[70] The award, pursuant to TILA, is mandatory.[71] Because the federal and state governments lack the resources to adequately police the marketplace and to protect consumers, federal and state consumer protection laws depend upon the private enforcement by aggrieved consumers. The ability of consumers to bring such cases depends upon the availability of private attorneys willing to bring these cases against well-heeled businesses. Accordingly, TILA provides that successful litigants are entitled to recover a reasonable attorney's fee based upon the work performed in the case. The availability of such fees enable private attorneys to handle cases that involve small dollar amounts but which raise complex legal issues.

Plaintiffs' claim for the breach of the implied warranty of merchantability was brought pursuant to MMWA, 15 U.S.C. § 2310(d)(1). Section 2310(d)(2) provides that:

> If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement

---

[70] 15 U.S.C. § 1640(a)(3).

[71] *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978)(Title VII).

and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

Thus, Magnuson-Moss provides that a Plaintiff may recover costs and expenses, including attorney's fees based upon the attorney time actually expended.

Attorney's fees and costs are also mandatory under EFTA: "[I]n the case of any successful action to enforce the foregoing liability, [any person who fails to comply with provisions of this subchapter is liable to the consumer for] the costs of the action, together with a reasonable attorney's fee as determined by the court."[72]

Plaintiffs are also entitled to fees under CUTPA.  Conn. Gen. Stat. §42-110g(d) provides: "in any action brought by a person under this section, the court may award, to the Claimant, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." The Connecticut Supreme Court has held that a Plaintiff who establishes a CUTPA claim is entitled to attorney's fees. [73]  Specifically, the Court stated, "Since CUTPA expressly permits the court to award 'costs and reasonable attorney's fee based on the work reasonably performed by an attorney' *General Statutes* § 42-110g (d); the [parties claiming CUTPA violations] are clearly entitled to such fees.[74]

Awarding attorney's fees is an extremely important component in promoting private enforcement of the CUTPA:

---

[72] 15 U.S.C. § 1693m(a)(3); *see also Bisbey v. D.C. Nat. Bank*, 793 F.2d 315, 318 (D.C. Cir. 1986)

[73] *Barco Auto Leasing Corp. v. House*, 202 Conn. 106, 120 (1987).
[74] *Id. See also* ROBERT M. LANGER ET AL., CONNECTICUT UNFAIR TRADE PRACTICES (2003).

The policy behind CUTPA, namely, to encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices, is furthered by our conclusion. Integral to effecting this policy, and reflected in the 1976 amendment, is the desire to encourage attorneys to accept and litigate CUTPA cases. CUTPA cases, however, may entail long hours with little likelihood of an award that will cover reasonable expenses. For this reason, General Statutes § 42-110g (d) offers an attorney who accepts a CUTPA case the prospect of recovering  reasonable fees and costs.[75]

Denying attorney's fees would have a chilling effect and would be contrary to the

purpose of the fee-shifting statute.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,*[76] the

Second Circuit clarified the proper analysis for a district court to undertake in exercising

its considerable discretion in awarding attorney's fees.  A court is to

consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay…

[I]n determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.[77]

Essentially, the Second Circuit directs district courts to consider panoply factors

when considering a fee request:

---

[75] *See Gill v. Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 33 App. Ct. 1987).  *See also Fabri v. United Techs. Int'l, Inc.*, 193 F. Supp. 2d 480, 486 (D. Conn. 2002), where not awarding attorney's fees, "would be contrary to the purpose of the fee-shifting statute, to encourage the prosecution of meritorious claims for violation of the substantive provisions of CUTPA."; and *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617, (1981), where recovery of attorneys' fees, "serves to encourage private CUTPA litigation."
[76] 522 F.3d 182 (2d Cir. N.Y. 2008)
[77] *Id.* at 184.

The meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.[78] We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson[79] factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.[80]

*Arbor Hill* was a case brought under the Voting Rights Act[81] and involved private local counsel from Albany, New York, a national voting-rights legal non-profit and an experienced, out-of-district firm known for its "muscle" and Second Circuit Appellate work.[82] The thrust of the matter was that the out-of-district firm sought to recoup its fees when billing at its Southern District of New York-level when litigating a case in the Northern District of New York, where the market-rate for fees was lower. This district-based analysis of a reasonable fee is called the "forum rule". The Second Circuit in *Arbor Hill* directed courts in this circuit that rather than a mechanistic application of a

---

[78] "While we do not purport to require future panels of this court to abandon the term—it is too well entrenched—this panel believes that it is a term whose time has come." (Footnote in original, numbering modified herein.)

[79] The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974)

[80] *Arbor Hill*, supra at 190.

[81] The Second Circuit's analysis focused on the reputational benefit to counsel, as they accepted the case pro bono at the onset. That factor is inapplicable herein.

[82] *Id.*, at 185.

reasonable rate as determined by the forum rule multiplied the number of hours worked using the lodestar calculation was too limiting of a formula, courts should examine *all* case specific factors, including the *Johnson* factors, in determining the amount of a fee award.[83] The decision urges a philosophical shift from "lodestar" to the "presumptively reasonable fee."[84]

The accompanying Declaration of Daniel S. Blinn provides a general description of the work performed, the time expended and the hourly rates.  Plaintiff seeks a reasonable fee of $7,000.

The fees are based upon hourly rates of $400 for Daniel S. Blinn, $275 for his associate, Brendan L. Mahoney, $150 for paralegal, Lori Miner, and $95 for legal assistant Dora Fernandez.

Attorney Blinn has practiced law for more than 30 years, and he has focused his practice on consumer protection matters for more than 20 years.  He has handled more than 1,000 cases involving car dealerships during that time.  He is a former and the current chair of the Consumer Law Section of the Connecticut Bar.  Attorney Blinn has served on the national board of directors of the National Association of Consumer Advocates ("NACA"), and he served for five years as the Treasurer of that organization. He has also served as the chair of NACA's Connecticut chapter for more than eight years.

He is also a regular presenter at conferences run by NACA, the National Consumer Law Center, and the Connecticut Bar Association.  In ruling on another

---

[83] *Id.,* at 184-185.
[84] *Id.,* at 184.

attorney's fee application, United States Magistrate Judge Thomas P. Smith referred to him as one of the two "preeminent consumer law attorneys", practicing in the District of Connecticut.[85] The other attorney referenced by Judge Smith was Joanne Faulkner.

The claimed hourly rate of $400/hour has been approved in multiple decisions by federal and state court judges. Consequently, the undersigned's hourly rates and the rates of his staff have been approved in numerous court decisions, many of which have involved claims against auto dealers. E.g., *Bristol v. Lake Pocotopaug Auto*, LLC, No. 3:13cv911JBA (D. Conn. Jun. 27, 2014) (found the hourly rates and hours claimed to be reasonably billed by a "well respected consumer attorney and firm"); *Franco v. A Better Way Wholesale Autos, Inc.*, No. 3:14cv422VLB (D. Conn. May 31, 2016); *Linsley v. FMS Investment Corp.*, No. 3:11cv00961VLB (D. Conn. June 2, 2014); *Wise v. Cavalry Portfolio Services, LLC*, No. 3:09-cv-00086CSH (D. Conn. Sept. 23, 2013); *Woods, et al v. Prime Auto Group, LLC*, No. 3:13cv161RNC (D. Conn. Mar. 21, 2014.

Additionally, in 2011, United States Magistrate Judge Holly Fitzsimmons surveyed recent cases, noting that many approved hourly rates of $400/hr and more for comparably experienced attorneys, and Judge Fitzsimmons approved rates of $485/hr and $400/hr for attorneys in that case.[86]

Attorney Brendan Mahoney has been admitted to the practice of law for three years and has no disciplinary record. His claimed hourly rate of $275 is well within the standards for lawyers of his experience.

---

[85] *See Negron v. Mallon Chevrolet*, Order on Plaintiff's Motion for Attorney's Fees, September 24, 2012, No. 3:08-cv-00182-TPS, 2012 WL 4358634 (D. Conn. 2012).
[86] *Valley Housing Ltd Partnership v. City of Derby*, 802 F.Supp.2d 359 (D. Conn. 2011).

## V.    DAMAGES

Actual damages (TILA, CUTPA, Breach of Warranty)

|  |  |
|---|---|
| "Bank Fee" | $1,100 |
| Down payment: | $2,000 |
| Payments made under the Contract: | $7,243.42 |
| Vehicle inspection: | $650 |
| TILA statutory damages: | $2,000 |
| EFTA statutory damages: | $1,000 |
| Punitive damages: | $9,893.42 |
| Attorney's Fees: | $7,000[87] |
| Total: | $30,886.84 |

---

[87] Alternatively claimed as common law punitive damages.

## VI.   CONCLUSION

In light of the foregoing, judgment should enter against Empire Auto in the amount of $30,886.84.

PLAINTIFFS, MARIO ALEXIS and DOUGENIE ALEXIS,

By: */s/ Brendan L. Mahoney (ct29839)*
    Daniel S. Blinn (ct02188)
    dblinn@consumerlawgroup.com
    Brendan L. Mahoney (ct29839)
    bmahoney@consumerlawgroup.com
    Consumer Law Group, LLC
    35 Cold Spring Road, Suite 512
    Rocky Hill, Connecticut 06067
    Tel (860) 571-0408
    Fax (860) 571-7457

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of March, 2018, a copy of foregoing Motion for Entry of Default for Failure to Plead was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ Brendan L. Mahoney*
Brendan L. Mahoney